**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LIDA MAE ORBASH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-1039 |
| | ) | United States Magistrate Judge |
| CAROLYN W. COLVIN, ACTING | ) | Cynthia Reed Eddy[1] |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

I.      **Introduction**

Plaintiff Lida Mae Orbash ("Orbash") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act ("Act") [42 U.S.C. §§ 401-433]. The matter is presently before the Court on cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56. ECF Nos. 9 & 14. For the foregoing reasons, Orbash's motion for summary judgment (*ECF No. 9*) will be denied, the Commissioner's motion for summary judgment (*ECF No. 14*) will be granted, and the Commissioner's decision denying Orbash's application for benefits will be affirmed.

II.      **Procedural History**

Orbash protectively applied for disability insurance benefits on July 24, 2010, alleging that she had become "disabled" on August 29, 2008. R. at 15, 109. The application was

---

[1]  By consent of the parties, (ECF Nos. 11, 12), pursuant to 28 U.S.C. § 636(c), the Federal Magistrate Judges Act, the undersigned has full "authority over dispositive motions…and entry of final judgment, all without district court review." *Roell v. Withrow*, 538 U.S. 580, 585 (2003); *In re Search of Scranton Hous. Auth.*, 487 F.Supp.2d 530, 535 (M.D.Pa. 2007).

administratively denied on January 26, 2011.  R. at 50.  Orbash responded on February 28, 2011, by filing a request for an administrative hearing.  R. at 57.  On April 4, 2012, a hearing was held in Morgantown, West Virginia, before Administrative Law Judge ("ALJ") Karl Alexander.  R. at 29.  Orbash, who was represented by counsel, appeared and testified at the hearing.  R. at 33-42.  Dr. Larry Ostrowski, an impartial vocational expert, provided testimony about the expectations of employers existing in the national economy.  R. at 42-46.  In a decision dated April 25, 2012, the ALJ determined that Orbash was not "disabled" within the meaning of the Act.  R. at 15-24.

On May 22, 2012, Orbash sought administrative review of the ALJ's decision by filing a request for review with the Appeals Council.  R. at 8-10.  The Appeals Council denied the request for review on May 29, 2013, thereby making the ALJ's decision the "final decision" of the Commissioner in this case.  R. at 1.  Orbash commenced this action on July 18, 2013, seeking judicial review of the Commissioner's decision.  ECF Nos. 1-3.  Orbash and the Commissioner filed motions for summary judgment on December 27, 2013, and February 3, 2014, respectively.  ECF Nos. 9 & 14.  In accordance with 28 U.S.C. § 636(c)(1), the parties have consented to have this matter resolved by a United States magistrate judge.  ECF Nos. 11-12.  The motions for summary judgment filed by the parties are the subject of this memorandum opinion.

## III.    Standard of Review

This Court's review is plenary with respect to all questions of law.  *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999).  With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence."  42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record.  *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-

1191 (3d Cir. 1986).  Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted).  As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions.  He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983).  The administrative

law judge must consider all medical evidence contained in the record and provide adequate

explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d

955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated

rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose

of determining whether a claimant is "disabled" within the meaning of the Act. The United

States Supreme Court has summarized this process by stating as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will
> not review the claim further. At the first step, the agency will find non-disability
> unless the claimant shows that he is not working at a "substantial gainful
> activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find
> non-disability unless the claimant shows that he has a "severe impairment,"
> defined as "any impairment or combination of impairments which significantly
> limits [the claimant's] physical or mental ability to do basic work activities." §§
> 404.1520(c), 416.920(c). At step three, the agency determines whether the
> impairment which enabled the claimant to survive step two is on the list of
> impairments presumed severe enough to render one disabled; if so, the claimant
> qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the
> list, the inquiry proceeds to step four, at which the SSA assesses whether the
> claimant can do his previous work; unless he shows that he cannot, he is
> determined not to be disabled. If the claimant survives the fourth stage, the fifth,
> and final, step requires the SSA to consider so-called "vocational factors" (the
> claimant's age, education, and past work experience), and to determine whether
> the claimant is capable of performing other jobs existing in significant numbers in
> the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes

omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject

to judicial review under the "substantial evidence" standard. *McCrea v. Commissioner of Social

Security*, 370 F.3d 357, 360-361 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's

decision cannot be affirmed on a ground other than that actually relied upon by the agency in

making its decision.  In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law.  That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.  To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.  The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context.  *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001).  Thus, the Court's review is limited to the four corners of the ALJ's decision.  *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

## IV.    The ALJ's Decision

In his decision, the ALJ determined that Orbash had not engaged in substantial gainful activity subsequent to her alleged onset date.  R. at 17.  Orbash was found to be suffering from irritable bowel syndrome, major depressive disorder, generalized anxiety disorder, posttraumatic stress disorder ("PTSD"), and a panic disorder with agoraphobia.  R. at 17.  These impairments were deemed to be "severe" under the Commissioner's regulations.  R. at 17; 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).  The ALJ concluded that Orbash's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. at 17-18.

In accordance with 20 C.F.R. § 404.1545, the ALJ assessed Orbash's "residual functional capacity"[2] as follows:

---

[2] The term "residual functional capacity" is defined as "that which an individual is still able to do despite the limitations caused by his or her impairments."  *Hartranft v. Apfel*, 181 F.3d 358, 359, n. 1 (3d Cir. 1999)(parentheses omitted), citing 20 C.F.R. § 404.1545(a).  The same residual functional capacity

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except the work must: not entail climbing of ladders, ropes or scaffolds; be in a low stress environment with no production line or assembly line type of pace and no independent decision-making responsibilities; limited to unskilled work involving only routine and repetitive instructions and tasks; and should have no interaction with the general public and minimal, no more than occasional, interaction with co-workers and supervisors.

R. at 18. Orbash had "past relevant work"[3] experience as a legal secretary.[4] R. at 43, 182. Dr. Ostrowski classified that position as a "skilled"[5] job at the "sedentary"[6] level of exertion.[7] R. at 43. Since Orbash was found to be capable of performing only "unskilled"[8] work, it was determined that she could not return to her past relevant work. R. at 23.

---

assessment is used at the fourth and fifth steps of the sequential evaluation process. 20 C.F.R. §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii).

[3] "Past relevant work" is defined as "substantial gainful activity" performed by a claimant within the last fifteen years that lasted long enough for him or her to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). The Commissioner has promulgated comprehensive regulations governing the determination as to whether a claimant's work activity constitutes "substantial gainful activity." 20 C.F.R. §§ 404.1571-404.1576, 416.971-416.976.

[4] Orbash testified that she had worked as an assistant to a district justice. R. at 40. Dr. Ostrowski testified that, according to the Dictionary of Occupational Titles, Orbash's prior duties were akin to those typically performed by a legal secretary. R. at 43.

[5] "Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced. Skilled work may require laying out work, estimating quality, determining the suitability and needed quantities of materials, making precise measurements, reading blueprints or other specifications, or making necessary computations or mechanical adjustments to control or regulate the work. Other skilled jobs may require dealing with people, facts, or figures or abstract ideas at a high level of complexity." 20 C.F.R. §§ 404.1568(c), 416.968(c).

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

[7] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c). Orbash testified that she had lifted boxes weighing up to forty pounds while working as an assistant to a district justice. R. at 40. In light of Orbash's testimony, it appears that she performed her duties at the "medium" level of exertion even though the Dictionary of Occupational Titles classified her position as a "sedentary" job. R. at 40, 43.

[8] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, [the

Orbash was born on March 12, 1964, making her forty-four years old on her alleged onset date and forty-eight years old on the date of the ALJ's decision. R. at 23, 109. She was classified as a "younger person" under the Commissioner's regulations.[9] 20 C.F.R. § 404.1563(c). Orbash had a high school education and an ability to communicate in English. R. at 166, 168; 20 C.F.R. § 404.1564(b)(4)-(5). Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Orbash could work as a kitchen helper, commercial cleaner or hand packager. R. at 24. Dr. Ostrowski's testimony established that those jobs existed in the national economy for purposes of 42 U.S.C. § 423(d)(2)(A).[10] R. at 44.

## V. Discussion

Orbash completed high school in 1982. R. at 182. She started to work as a magisterial assistant in September 1997. R. at 182. In 2001, Orbash was involved in an abusive relationship. R. at 254. Her PTSD is attributable to "physical and sexual abuse" perpetrated by her former boyfriend.[11] R. at 350. On August 29, 2008, Orbash took a leave of absence from her job for medical reasons. R. at 33, 167, 336. She did not return to work. R. at 33, 336. At the

Commissioner] consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs." 20 C.F.R. §§ 404.1568(a), 416.968(a).

[9] The regulations recognize that "younger persons" between the ages of forty-five and forty-nine are more limited in their ability to adjust to other work than are persons who have not yet attained the age of forty-five. 20 C.F.R. §§ 404.1563(c), 416.963(c).

[10] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003). This burden is commonly satisfied by means of vocational expert testimony. *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

[11] The precise nature of Orbash's relationship with this particular boyfriend is unclear. During a consultative psychological evaluation performed by Dr. Sandy Vujnovic on January 15, 2011, Orbash "t[old] a somewhat bizarre story about this boyfriend breaking into her apartment and then 'refusing to leave' for a year." R. at 294. The boyfriend was apparently removed from the residence after Orbash obtained a protection-from-abuse order against him. R. at 294. According to Dr. Vujnovic, Orbash stated that she had tolerated the abuse for a full year because the magistrate for whom she was working had warned her "not to cause any trouble." R. at 294.

hearing, Orbash testified that she had stopped working due to severe depression, sleeplessness, panic attacks, stress, and an inability to concentrate. R. at 34. She stated that her mental impairments had affected her physical condition, making it difficult for her to move her bowels. R. at 34.

After losing her job as a magisterial assistant, Orbash opened up an exercise facility that was accessible twenty-four hours per day. R. at 41. She evidently spent about two hours at the facility each day. R. at 41. Orbash testified that she had been unable to maintain her management duties because of difficulties stemming from her impairments. R. at 41. On June 1, 2010, Orbash sold[12] the exercise facility to Thomas Lowden. R. at 116.

Orbash protectively applied for disability insurance benefits on July 24, 2010. R. at 15, 109. During the summer of 2010, Orbash began to make "suicidal statements" suggesting that "she did not want to wake up." R. at 239, 243. On July 27, 2010, Orbash's husband contacted police officers and informed them of the situation. R. at 239, 243. Because of her seemingly suicidal expressions, Orbash was admitted[13] to Fairmont General Hospital in Fairmont, West Virginia, for inpatient psychiatric treatment. R. at 239, 243. The next day, she insisted that she was not suicidal and asked to be discharged. R. at 213. Her husband was "very supportive" and agreed to take her home. R. at 213. Dr. Shahnaz Younus discharged Orbash on July 30, 2010. R. at 213-214. After being discharged, Orbash continued to receive psychiatric treatment on an outpatient basis. R. at 292-293. She was given prescriptions for Wellbutrin, Trazodone, Clonazepam and Xanax. R. at 293.

---

[12] In a letter dated August 23, 2010, Thomas Lowden referred to himself as the "new owner" of the exercise facility. R. at 116. Given the context of the letter, the Court assumes that Orbash had an ownership interest in the facility prior to June 1, 2010. R. at 116.

[13] It is not clear whether Orbash was involuntarily committed to Fairmont General Hospital in accordance with the provisions of West Virginia law, or whether she agreed to be hospitalized. Although certain portions of the record refer to Orbash as an "involuntary patient," other portions suggest that she was admitted "voluntarily." R. at 239, 243, 248.

Dr. Dilip S. Kar, a nonexamining medical consultant, opined on December 30, 2010, that Orbash had no physical limitations. R. at 285-291. Orbash later obtained psychiatric treatment from healthcare providers affiliated with West Virginia University. R. at 330-367. On January 6, 2011, Orbash told Dr. Umair Akhtar that she was gambling three to four times per week and "spending a lot of money" in the process. R. at 330. She expressed a concern that she was becoming addicted to gambling. R. at 330.

On January 15, 2011, Dr. Sandy Vujnovic performed a consultative psychological evaluation of Orbash in connection with her application for disability insurance benefits. R. at 292-297. After completing the evaluation, Dr. Vujnovic reported that Orbash was "moderately" limited in her abilities to understand, remember and carry out detailed instructions, respond appropriately to work pressures in a usual work setting, and interact appropriately with supervisors, co-workers, and members of the general public. R. at 296. Only "slight" limitations were found in Orbash's abilities to make judgments on simple work-related decisions and respond appropriately to changes in a routine work setting. R. at 296. In her examination report, Dr. Vujnovic stated that she did not consider Orbash to be a "reliable informant." R. at 292. Dr. Vujnovic further asserted that Orbash's appearance during the evaluation and the amount of benzodiazepines being prescribed were "strongly suggestive of possible substance abuse or dependence." R. at 295. It was noted that "family conflicts" were potentially contributing to Orbash's "distress." R. at 295.

Dr. Douglas Schiller, a nonexamining psychological consultant, reviewed Orbash's medical records to consider her potential eligibility for benefits. On January 20, 2011, Dr. Schiller expressed the view that Orbash was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment." R.

at 303. In the narrative portion of his report, Dr. Schiller stated that Orbash was "able to carry out very short and simple instructions," and that she had no restrictions affecting her "basic understanding and memory." R. at 303. Orbash's subjective complaints were deemed to be only "partially credible." R. at 303. Her application for disability insurance benefits was administratively denied on January 26, 2011. R. at 50.

After learning of the denial of her claim, Orbash started to sleep excessively. R. at 332. Dr. J. Scott Mizes, a treating psychologist, observed on January 31, 2011, that Orbash was trying to sleep in order to "avoid the negative feelings" that she had about herself. R. at 332. At that time, Orbash was "anxious" and trying to "get out of" going on a planned family trip to the Bahamas. R. at 332. One week later, Dr. Mizes noted that Orbash had recognized her sleeping to be "an avoidance behavior." R. at 333. On February 9, 2011, Dr. Elizabeth Kane reported that Orbash was "gambling at a local casino" whenever she was "stressed." R. at 334. Although Orbash ultimately went to the Bahamas with her family, "she stayed in the hotel room and slept" for much of the vacation. R. at 336.

At some point during the spring or early summer of 2011, Orbash became separated from her husband and moved in with her sister. R. at 337, 347, 350. After the move, she started to spend a significant amount of time sleeping in her bedroom. R. at 339. On April 29, 2011, Dr. Kane noted that Orbash was living in a basement and "d[id] not like to be around people." R. at 342. Nonetheless, Dr. Kane also observed that Orbash was planning to appear at a bar that was being dedicated to a deceased family member. R. at 342. On May 9, 2011, Dr. Mizes reported that Orbash was staying at home and sleeping anywhere from fourteen to fifteen hours per day. R. at 344. As of June 1, 2011, Orbash was complaining of panic attacks occurring at the frequency of three times per day. R. at 345. She stated that each panic attack typically lasted

anywhere from thirty to forty-five minutes. R. at 345. Dr. Mizes suggested that the panic attacks may have been triggered by critical comments made by Orbash's sister. R. at 345. In the meantime, Orbash's husband continued to reside in what had previously been the couple's mutual home. R. at 348.

During the summer of 2011, Orbash's marital situation continued to deteriorate. R. at 248. She eventually lost interest in reconciliation and became focused on obtaining spousal support at a hearing scheduled for July 28, 2011. R. at 348. One week before the hearing, Dr. Mizes stated that Orbash was discussing her impending divorce only "in a very superficial way" because "she d[id] not want to bother others with her problems." R. at 349. Orbash was apparently unsuccessful in her initial attempt to procure spousal support. R. at 350, 352. The situation left her with "absolutely no money." R. at 352. Orbash eventually stopped taking her medications because she could no longer afford them. R. at 354. On August 12, 2011, Dr. Mizes encouraged Orbash to directly confront her agoraphobia by driving herself to treatment sessions and grocery stores. R. at 353. Orbash responded by asserting that she would only be able to go shopping "after midnight," when very few people would be around. R. at 353.

Orbash later obtained a medical card so that she could pay for her prescribed medications. R. at 356. During a hearing held on September 27, 2011, it was determined that Orbash was entitled to spousal support in the amount of $700.00 per month. R. at 354, 356, 361. Although Orbash had asked for twice as much money, she was given a reduced award because a court concluded that she was "able to work." R. at 357. Orbash ultimately decided to appeal the court's decision. R. at 357. In support of the appeal, Orbash presented a letter from her treating psychiatrist, Dr. Michael Ang-Rabanes. R. at 357. In his letter, Dr. Ang-Rabanes stated as follows:

> I am writing this letter per the request of Ms. Lida Orbash. I am the psychiatrist currently treating her at Chestnut Ridge Hospital. Ms. Orbash has an extensive history of abuse, both physical and sexual. She also suffers from profound depression which contributes to multiple symptoms including feelings of guilt, worthlessness, loneliness, anhedonia, poor sleep, focus, and energy. She has very limited social support and multiple psychosocial stressors, including having underwent a recent divorce. Due to the above factors, she is not employable.

R. at 322. On November 18, 2011, Dr. Jessica S. Whipkey reported that Orbash was sleeping roughly twenty-one hours per day because "she d[id] not want to think about her divorce." R. at 359. Orbash apparently told Dr. Whipkey that she wanted to work, but that she was unable to do so because of anxiety and the side effects of her medications. R. at 359.

For the next several weeks, Orbash continued to sleep anywhere from eighteen to twenty-one hours per day. R. at 363. Dr. Mizes opined on December 14, 2011, that Orbash was suffering from "hypersomnia." R. at 363. Despite this situation, however, Dr. Mizes observed that Orbash was "able to muster the psychological energy needed to make various filings with the court in order to protect herself in the divorce proceedings." R. at 363. On January 6, 2012, Dr. Mizes noted that Orbash had lost fifteen to twenty pounds because she was sleeping excessively and eating only one or two meals per day. R. at 364. Since Orbash was not experiencing suicidal ideation, Dr. Mizes concluded that there was no "cause for inpatient hospitalization." R. at 364. Two weeks later, Orbash was still sleeping up to twelve hours per day. R. at 365.

Orbash spoke with Dr. Mizes about her condition on January 30, 2012. R. at 366. Making reference to the impending hearing before the ALJ, Dr. Mizes asserted that Orbash was clearly "not able to work in her current psychological state." R. at 366. He remarked that several members of Orbash's family had described her as being "crazy" and "criticize[d] her for getting psychotherapy and psychiatric medication" from "quacks." R. at 366. On February 17,

2012, Dr. Ang-Rabanes opined that if Orbash were to be gainfully employed, she would "often" experience difficulties in dealing with supervisors and co-workers, managing a low-stress work environment, and maintaining her concentration, persistence and pace throughout the course of a standard workday. R. at 368. Dr. Ang-Rabanes predicted that Orbash's impairments would cause her to miss roughly fifteen days of work per month if she were to be employed on a full-time basis. R. at 368. At the hearing, Dr. Ostrowski testified that no jobs existed in the national economy for an individual who needed to miss more than two days of work per month. R. at 45.

When questioned about her treatment regimen, Orbash testified that she was preparing to undergo "electric shock treatments." R. at 36. The treatments were apparently postponed so that Orbash could participate in an upcoming hearing related to her divorce. R. at 36. Orbash described erratic and inconsistent sleeping patterns, claiming that she would typically sleep anywhere from one to twenty-one hours per night. R. at 37. She also complained of crying spells and heart palpitations stemming from her anxiety. R. at 38.

In his decision, the ALJ observed that Dr. Vujnovic had not found Orbash to be a "reliable informant." R. at 20. Dr. Vujnovic's suspicion about "possible substance abuse or dependence" was relied upon as a factor weighing against Orbash's credibility. R. at 21. The portion of Dr. Vujnovic's examination report suggesting that Orbash's "distress" could be attributed to "family conflicts" was quoted verbatim in the ALJ's decision. R. at 20-21. The ALJ found Dr. Ang-Rabanes' assessment to be "inconsistent with the medical evidence of record." R. at 22. The views expressed by Dr. Kar and Dr. Schiller were accorded "considerable weight" in determining Orbash's residual functional capacity. R. at 22. The ALJ relied on Orbash's frequent presence in gambling casinos and her vacation to the Bahamas in order to refute her allegation of disabling agoraphobia. R. at 22.

The arguments advanced by Orbash all relate, in one way or another, to the ALJ's residual functional capacity assessment. ECF No. 10 at 2. While discussing the impending hearing before the ALJ, Dr. Mizes observed that Orbash was clearly "not able to work in her current psychological state." R. at 366. In determining Orbash's work-related abilities and limitations, the ALJ noted that Dr. Mizes had found Orbash to be suffering from a panic disorder with agoraphobia, depression, and PTSD. R. at 20. The ALJ did not specifically reference Dr. Mizes' statement suggesting that Orbash was disabled. R. at 18-23. Orbash contends that the ALJ's failure to address Dr. Mizes' "medical opinion" constituted a "clear error." ECF No. 10 at 20-21.

Under the Commissioner's regulations, unsupported opinions of "disability" do not qualify as "medical opinions" entitled to consideration. *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003); *Luce v. Astrue*, 523 F.Supp.2d 922, 936 (S.D.Iowa 2007); *Earl-Buck v. Barnhart*, 414 F.Supp.2d 288, 293 (W.D.N.Y. 2006); *Wheat v. Barnhart*, 318 F.Supp.2d 358, 364, n. 11 (M.D.La. 2004); 20 C.F.R. § 404.1527(d). A true "medical opinion" particularly describes what a claimant can or cannot do in light of his or her medical condition. 20 C.F.R. § 404.1527(a)(2). Because Dr. Mizes merely stated that Orbash was "not able to work," the ALJ did not commit reversible error by failing to specifically discuss that "opinion." That is especially true in this case, since Dr. Mizes' comment was made in the context of a discussion about Orbash's potential entitlement to disability insurance benefits. R. at 366. The ultimate question of disability is reserved for the Commissioner's determination. *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990); 20 C.F.R. § 404.1527(e)(1). The Commissioner's regulations plainly provide that conclusory opinions on that issue "are *not* medical opinions." 20 C.F.R. § 404.1527(d)(emphasis added).

The ALJ rejected Dr. Ang-Rabanes' assessment on the ground that it was "inconsistent with the medical evidence of record and based on subjective complaints alone." R. at 22. Medical findings cannot be rejected on the theory that they are based solely on a claimant's subjective complaints unless the record contains evidence suggesting that those complaints were misleading or otherwise lacking in candor. *Ryan v. Commissioner of Social Security*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008). Invoking this principle, Orbash faults the ALJ for attributing the limitations described by Dr. Ang-Rabanes to her subjective complaints. ECF No. 10 at 16. In this case, however, the ALJ relied on specific evidence indicating that Orbash had not been honest with some of the treating and examining sources. Records of Orbash's hospitalization stated that she had acknowledged being suicidal while "refus[ing] to disclose a plan." R. at 247. The ALJ characterized Orbash's behavior as "a pointless effort to seek mental treatment and then not be candid and forthcoming with the provider." R. at 21. In her examination report, Dr. Vujnovic specifically questioned whether Orbash was a "reliable informant." R. at 292. The ALJ relied on Dr. Vujnovic's observations in determining that Orbash's subjective complaints were not entirely credible. R. at 20-21. Given that the ALJ's findings pertaining to Orbash's credibility were grounded in evidentiary support, they are owed significant deference in the present context. *Diaz v. Commissioner of Social Security*, 577 F.3d 500, 506 (3d Cir. 2009).

Opinions expressed by treating sources do not bind the Commissioner on the issue of a claimant's residual functional capacity. *Brown v. Astrue*, 649 F.3d 193, 196, n. 2 (3d Cir. 2011). When conflicting medical assessments are presented, an administrative law judge is ordinarily "free to choose the medical opinion of one doctor over that of another." *Diaz*, 577 F.3d at 505. In choosing to do so, however, the administrative law judge must explain his or her reasons for rejecting any relevant evidence that is favorable to the claimant. *Reefer v. Barnhart*, 326 F.3d

376, 381-382 (3d Cir. 2003). This requirement facilitates the meaningful judicial review contemplated by the Act. *Burnett v. Commissioner of Social Security Administration*, 220 F.3d 112, 119-122 (3d Cir. 2000).

Orbash complains that the ALJ "never actually assigned weight to" Dr. Vujnovic's opinion. ECF No. 10 at 12. Contrary to Orbash's suggestion, however, the ALJ was not required to "use particular language or adhere to a particular format in conducting his analysis." *Jones*, 364 F.3d at 505. The ALJ obviously relied on Dr. Vujnovic's examination findings in determining Orbash's residual functional capacity. He addressed the limitations in Orbash's abilities to understand, remember and carry out detailed instructions by restricting her to a range of "unskilled work involving only routine and repetitive instructions and tasks." R. at 18, 296. The "moderate" limitation in Orbash's ability to respond appropriately to work pressures in a usual work setting was accommodated by the portion of the residual functional capacity assessment restricting her to work performed "in a low stress environment with no production line or assembly line type of pace and no independent decision-making responsibilities." R. at 18. The ALJ accounted for Orbash's interactive restrictions by precluding public contact and limiting her to "minimal" and "occasional" interaction with supervisors and co-workers. R. at 18, 296. By explaining his reasons for discrediting Dr. Ang-Rabanes' assessment while adopting the limitations described by Dr. Vujnovic, the ALJ implicitly credited Dr. Vujnovic's examination report over Dr. Ang-Rabanes' contrary findings. *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 205 (3d Cir. 2008). The Act does not require the Court to remand this case in search of a "perfect opinion."[14] *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).

---

[14] The Court is unmoved by Orbash's suggestion that the Commissioner's attorneys have engaged in "sanctionable" conduct by positing reasons for affirmance that are not grounded in the factual findings

In an attempt to discredit Dr. Vujnovic's findings, Orbash asserts that the consultative examination "occurred before most of the significant medical evidence of record even existed." ECF No. 10 at 12. This argument is problematic for several reasons. As an initial matter, the governing law imposes no precise limit on the amount of time that may pass between the preparation of a medical report and an administrative decision adopting the opinions expressed therein. *Chandler v. Commissioner of Social Security*, 667 F.3d 356, 361 (3d Cir. 2011). Furthemore, Dr. Vujnovic's evaluation was performed almost two and a half years after Orbash's alleged onset date. R. at 109, 292-297. If Orbash was "disabled" as early as August 29, 2008, and remained so through the date of the ALJ's decision, one would certainly expect that "disability" to have manifested itself by January 15, 2011. In his decision, the ALJ pointed out that Orbash had not received mental health treatment prior to being admitted to Fairmont General Hospital on July 27, 2010. R. at 21. On January 6, 2011, Dr. Akhtar reported that Orbash was only sleeping at the rate of four hours per night and spending a considerable amount of time at gambling casinos. R. at 330. It was certainly reasonable for the ALJ to conclude that, as of January 2011, Orbash was capable of working within the parameters described in Dr. Vujnovic's examination report. R. at 332.

---

actually made by the ALJ. ECF No. 17 at 2-3. It is true that, under *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), "the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012). Nonetheless, the rule adopted in *Chenery Corp.* does not preclude a reviewing court from considering the entire record for the purpose of ascertaining what the Commissioner *actually determined*. *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 203-205 (3d Cir. 2008). The line between *discovering* the reasons for an administrative decision and *substituting* alternative reasons for that decision is not always easy to draw. In any event, the judicial task of drawing and observing that line is made easier when attorneys on both sides are free to advance all "reasonable and well-grounded arguments" in support of their respective positions. *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 545, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). Thus, the reasonable arguments advanced in the Commissioner's brief are not "sanctionable." ECF No. 15.

The documentary record suggests that Orbash's excessive sleeping may have been precipitated by the initial denial of her application for disability insurance benefits. R. at 332. It would be circular reasoning for one to conclude that Orbash was entitled to benefits *because of* depression *caused by* the denial of her application for those same benefits. Even after that denial, however, Orbash continued to express concerns that she was becoming addicted to gambling. R. at 334. She subsequently traveled to the Bahamas with her family. R. at 336. A court presiding over Orbash's divorce proceedings later concluded that she was able to work in some capacity. R. at 357. Although Dr. Mizes found Orbash to be suffering from hypersomnia, he acknowledged on December 14, 2011, that she was "able to muster the psychological energy needed to make various filings with the court in order to protect herself in the divorce proceedings." R. at 363. On January 20, 2012, Dr. Mizes stated that Orbash's "current period of severe depression" had started in 2001. R. at 365. Orbash continued to work as a magisterial assistant for seven years *after* the onset of that "current period." R. at 365. At the hearing, Orbash testified that, in her prior position, she had been expected to "go out in the middle of the night and arraign people and put them in jail." R. at 40. While the ALJ did not believe Orbash to be mentally capable of performing those duties at the time of his decision, he concluded that she retained the ability to engage in certain "unskilled" work activities performed in an environment involving minimal levels of stress. R. at 18-23. Dr. Kar reported that Orbash had no physical limitations. R. at 285-291. Recognizing that Orbash was suffering from irritable bowel syndrome, the ALJ concluded that Orbash was physically capable of performing "medium" work that did not involve certain postural maneuvers. R. at 19. The ALJ did not merely "rubber stamp" the findings of a particular medical professional. *Chandler*, 667 F.3d at 361. Instead, his decision reflected a careful balancing of all relevant evidence.

Orbash correctly points out that, at the administrative level, the ALJ was required to decide all factual issues based on "the preponderance of the evidence." 20 C.F.R. § 404.953(a). She maintains that, under that standard, her entitlement to benefits has been established. ECF No. 10 at 29. At this stage, however, the Commissioner's findings need only be "supported by substantial evidence" in order to be regarded as "conclusive." 42 U.S.C. § 405(g). In the context of judicial review, the Commissioner's factual findings need not be established by a "preponderance of the evidence." *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971). Those findings must be considered under "a deferential standard of review." *Jones*, 364 F.3d at 503. The Court has no mandate to re-weigh the evidence. *Hartranft*, 181 F.3d at 360 (explaining that a reviewing court cannot set aside factual findings that are "supported by substantial evidence" even if it "would have decided the factual inquiry differently").

**VI. Conclusion**

The Commissioner's decision denying Orbash's application for disability insurance benefits is "supported by substantial evidence" and will be affirmed. 42 U.S.C. § 405(g). Orbash's motion for summary judgment (*ECF No. 9*) will be denied, and the Commissioner's motion for summary judgment (*ECF No. 14*) will be granted. The record indicates that Orbash was insured for benefits through December 31, 2013. R. at 15, 17, 159. At the time of the hearing, Orbash was preparing to undergo "electric shock treatments." R. at 36. If her mental condition continued to deteriorate after the rendering of the ALJ's decision, she remains free to file a new application for the period of time commencing on April 26, 2012. No opinion is expressed as to whether Orbash is "disabled" within the meaning of the Act. The Court holds only that, on the basis of the existing record, the ALJ's decision is grounded in sufficient

evidentiary support to justify an affirmance under the applicable standard of review. An

appropriate Order follows.

By the Court:

s/Cynthia Reed Eddy
Cynthia Reed Eddy
United States Magistrate Judge

cc:     All counsel of record via CM-ECF

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

LIDA MAE ORBASH, )
)
         Plaintiff, )
)
    v. )    Civil Action No. 13-1039
)    United States Magistrate Judge
CAROLYN W. COLVIN, ACTING )    Cynthia Reed Eddy
COMMISSIONER OF SOCIAL )
SECURITY, )
)
         Defendant. )

## ORDER

AND NOW, this 28th day of May, 2014, IT IS HEREBY ORDERED that the Plaintiff's Motion

for Summary Judgment (*ECF No. 9*) is **DENIED**, that the Defendant's Motion for Summary

Judgment (*ECF No. 14*) is **GRANTED**, and that the final decision of the Commissioner of

Social Security is **AFFIRMED**.

                          By the Court:

                          s/ Cynthia Reed Eddy
                          Cynthia Reed Eddy
                          United States Magistrate Judge

cc:    All counsel of record via CM-ECF